Welcome back, Dave. Ms. Hester, welcome back on the Bird case. We're ready to hear from you whenever you're ready. May it please the court, there is a serious danger in this case that an innocent person has been convicted. John Bird was convicted of shooting Garshel despite his corroborated alibi based on two pieces of evidence. One, an identification made by a drunk victim whose perception and memory were admittedly impaired. And two, incriminating statements that Bird made while he was in alcohol withdrawal had been vomiting for two days and had been told he failed a polygraph. Bird's new evidence provides what was missing before, an alternative explanation for who shot Garshel and why. The evidence that Justin Denig was with Shell Christmas Eve night and Christmas Day. What were the issues that you just raised about the viability of the victim's identifications and any challenge to the confession by your client weren't they dealt with previously? They were dealt with previously but without the new evidence. So what I'm pointing out is... New evidence as to them or... As to the shooter. I am not talking about potential expert evidence at all. I'm talking about the new evidence as to who the shooter is. Because the evidence that Justin Denig... There's no new evidence that Mr. Shell was incorrect or that Mr. Bird failed, that Mr. Bird did not confess twice. What I am pointing out, he didn't confess twice. He made one incriminating statement after he was polygraphed, that's it. The first statement he made was completely exculpatory and gave his alibi, which was then corroborated at trial by one of the witnesses who was with him. And what I'm pointing out is how the new evidence would give the defense an opportunity to further undermine those two pieces of evidence that were already weak to begin with. Well that's not the test though, you have to show that there would probably be a probable acquittal, right? Right. That the new evidence would create a reasonable doubt. Well, I thought the test is that the new evidence would result in a probable acquittal. Well, it's probably reasonable doubt because that's how an acquittal occurs. Earlier you said that the evidence would undermine the government's case, but that's not enough, you would concede. There needs to be at least enough of an attack so as to probably result in a different verdict. Well, correct. But because the standard is so high on the government, all that we need to show is that the new evidence is enough to create a reasonable doubt and enough jurors to acquit him. And the district court, when it applied Rule 33, applied it erroneously by requiring that. The district court required us to present evidence that would overcome the evidence of his guilt. And you can see if you look at the order, the way that the court interpreted the evidence, he actually was putting the burden on us to prove that Byrd was innocent, but that's not the burden. The court required Byrd to prove with direct evidence that Denig shot Schell and ignored all of the circumstantial evidence indicating that Denig could have been the shooter. And the district court misapplied that weighing test in another way by refusing to consider the weaknesses in Schell's identification and Byrd's confession. And the court didn't consider at all the fact that Byrd had a corroborated alibi. And that's what, in Hernandez-Rodriguez, that type of misweighing is what led the court in Hernandez-Rodriguez to overturn the denial of the motion for a new trial. With respect to the corroborated alibi, as I understood the record, there was some question as to whether or not that alibi was, in fact, corroborated. Didn't the witness say that she was, in fact, induced or convinced to lie? No, she said that she was telling the truth. In fact, she offered up to the police that John Byrd's father had asked her to lie. And she said, I'm not going to lie for anybody. I'll say where he was. She didn't even know when Gar Schell was shot. She was just explaining where Byrd was. And you have to consider it's Christmas Eve and Christmas Day. Those are events that people tend to remember. Only if you're sober, I suppose. There were a lot of people who were less sober. Right. Well, she was sober. She was the one person in this. She was the only one. She was the only one who was sober. But it's interesting because Byrd gave his alibi, and hers almost exactly matches his, but there's no reason to think that she had any idea what Byrd had told Al when he explained where he had been. Evaluating Byrd's evidence under the correct standard leads to a conclusion that he should get a new trial because his new evidence tells for the first time, first of all, where Schell was and who he was with between dusk on Christmas Day, Christmas Eve and noon on Christmas Day. That was something that was completely absent at the trial. Nobody had any idea. It also shows that Denig had a motive and an opportunity to shoot Schell, and Byrd didn't. There was never any motive. The government admitted at trial that they didn't have any motive. Wasn't there? Go ahead, I'm sorry. No, you go ahead. What reason is advanced that the victim identified Byrd, was insistent it was Byrd? What evidence is there that he's wrong, deliberately or unintentionally? Here's the argument we would make at a new trial. He was very drunk, under the influence of other drugs, had been shot, and Denig and Byrd are very similar in stature and appearance, and he easily could have confused them in his mind. And here's what happened. Once he said once it was John Byrd at the scene, then after that, every time somebody talked to him, they suggested to him who it was. He's in the hospital room vomiting blood with his brother, who's already talked to the woman who found Schell at the scene, and with this FBI agent, and the brother says, well, we couldn't understand it at first, but eventually we figured out he was saying John Byrd. Well, how did they figure out he was saying John Byrd? Did they say, was it John Byrd? And then later, when Al interviews him the next time, he specifically says, was John Byrd there? So this plants in his mind the idea that John Byrd is the shooter, and the more he hears it, the more he adopts that as his own memory. Here's the other thing. Denig has admitted shooting Schell. He's asked a question that only the shooter would ask, and he refuses to answer questions about Schell's shooting based on his Fifth Amendment privilege. He was also located. Is that because he admits hitting him in the head with a pan? Well, he specifically refused to answer the question, did you shoot Schell? He asserted the Fifth Amendment to that. So that's in combination with the other evidence. That's a pretty compelling indication that he's the one who shot Schell. He also was found later that day. He admits that later that day he called for a ride from a campground that was a mile away from where Schell was found that day. So all these things together certainly give a jury a reason to find reasonable doubt. I'd like to back to— Is part of your argument that a person's assertion of their constitutional rights can be used to create an adverse inference? Absolutely, Your Honor. There are several evidentiary issues here, and that's one of them, because the district court just applied a per se, across-the-board rule. It's not a permissible inference when somebody pleads the Fifth, but that's incorrect, because what the court has to do is apply the Rule 403 balancing test to determine whether it's admissible or not. And the government relies solely on branch, but first of all, it's distinguishable, and second of all, it actually supports our position. Because in branch, the defendant was attempting to call a witness solely to plead the Fifth, but that's not what happened here. Denig got on the stand, he answered some of our questions, and then the rest he pleaded the Fifth to. When the government cross-examined him, he answered a bunch of their questions. He said Garshall wasn't in the trailer when I shot it up. So, you know, under those circumstances, certainly the court is required to engage in the 403 balancing test, and branch reflects that. Even though branch doesn't talk about Rule 403 specifically, it actually employs the Rule 403 balancing test, and that's what should have done here. Well, but didn't Judge Ridinger in the end assume the admissibility of all of this evidence, including, and maybe I'm wrong about this, the ability of the witness to invoke his Fifth Amendment right and say even if you accept all of this evidence, it just isn't enough? He did say that. He did not talk about the evidence specifically, so we don't know exactly what evidence that he considered. But that goes back to my point about him misapplying the Chavis test, the last prong of the Chavis test to determine whether, first of all, whether he imposed the incorrect burden on the defendant by requiring him to overcome the evidence of his guilt. And even though he stated the correct standard at one point, if you look at how he actually evaluated the evidence, what he was requiring Burr to do was to prove his innocence by requiring him to prove with direct evidence that Deneague shot Schell and ignoring all of the other circumstantial evidence that Deneague was the one who shot him. And then again, the second thing that he did was refusing to consider the effect of the new evidence on the old evidence at trial. He basically said confession, identification, end of story. We're not going to reconsider that stuff. But he had to reconsider it in light of the new evidence, and that's what he failed to do. I'd like to go back for a minute and talk about a couple of the evidentiary issues. I know I don't have time to talk about them all, but I would like to talk about the spousal testimonial privilege because the court applied that in an unprecedented and an impermissible way when it allowed Deborah Caro to assert that privilege. The Supreme Court and this court have never recognized a spousal testimonial privilege when the non-testifying spouse is not a party to the proceedings. And recently in the Under Seal case, this court specifically laid out the type of analysis that a court has to undergo in order to extend a privilege that has not been previously applied. That test requires the party claiming privilege to make a strong showing that extending the privilege would promote sufficiently important interest to outweigh the need for probative evidence in the administration of justice. And here the need for Deborah Caro's testimony could not be more compelling because she and her husband are the only people who recall Shell's whereabouts during the 18-hour period before he was found shot on the banks of Bunches Creek, and Denig has avoided testifying by pleading his Fifth Amendment privilege. Her testimony, at the very least, creates a reasonable doubt about Bird's guilt. It kind of depends on which of the multiple versions of her testimony she would offer. That's true, but some aspects of her statements were always consistent. And here's another thing. The government keeps talking about how she recanted her statement, but the only time that she did not say that he told her he shot Shell was when she was talking to our investigator, not to the police. She was talking to our investigator in the parking lot of McDonald's a day after her husband had been released and was living with her again, and she denied it to him, but she never denied that to the police. So I don't even know if you can properly call that a recantation. She was under no obligation to tell a private investigator that type of information. But allowing Caro to assert privilege here does little to advance the interest of marital harmony underlying the privilege because she had already provided information implicating Denig four times to police and to our investigator, and he had been informed about this by law enforcement. And since he's not a party and he can't be directly harmed by Caro's testimony, any additional damage to the marital relationship would be minimal, especially since the government has never expressed an interest in pursuing Denig for Shell's shooting. Allowing her to assert the privilege in this case prevents the development of the truth and for no good reason, and under seal prohibits that result. I'd also like to talk about this question that Denig asked James Allard. If I did shoot him in self-defense, can you guarantee me that I would not go to prison 100%? While a jury could and should draw the inference that this question reflects Denig's consciousness of his guilt, the district court was wrong when it concluded that the probative value of this question makes it hearsay. Under Rule 801, an utterance is hearsay only if the person making it intends it as an assertion and if it is offered to prove the truth of the matter asserted, and this question fails on both fronts. First, it's not an assertion because it's a request for information. Would a self-defense claim keep me from going to prison? And second, it doesn't say anything that can be true or false, so it can't be offered for the truth of the matter asserted. It is simply a question that an innocent person wouldn't ask, which permits an inference of guilt but does not make it hearsay. But even if it were hearsay, it would have been admissible as a statement against interest, which leads me to the district court's error in excluding all of Denig's incriminating out-of-court statements under Rule 804b-3. First of all, the district court gave no reasoning for and the government offers no argument to defend the exclusion of key incriminating statements by Denig to Allard and Owl. These statements were that Denig and Caro were drinking with Shell on Christmas Eve and Christmas Day 2008, that when Denig came out of the bathroom, he found Shell attempting to sexually assault Caro while she slept, that Denig was pissed off at Shell, that Denig and Caro dragged Shell to his car, and that Denig called for a ride later on Christmas Day at a campground that was a mile away from where Shell was found on Bunches Creek that same day. But furthermore, when the court did offer an explanation, it failed to take into account the required factors for determining whether statements are corroborated. And finally, the court erroneously imposed a requirement that corroborating circumstances be admissible evidence, but that requirement is not supported by the plain language of Rule 804b-3. This court should vacate Byrd's conviction and remand this case for a new trial. Thank you, Ms. Evans. Thank you. Gast. Good morning. I'm Don Gast. I represent the government in this matter. The district court did not abuse its discretion by denying the motion for a new trial because it found that none of the new evidence was admissible, but it also considered that even if it was, and considering all of the evidence, even that it just found to be inadmissible, this is not one of those rare circumstances where the evidence weighs heavily against the verdict against Mr. Byrd. Even though the original case against Mr. Byrd was strong, when this allegation came forward the government did all it could to pursue this claim, to pursue this new evidence. I strongly disagree with Ms. Hester that the government never targeted Mr. Denig. That is just simply not true. When Ms. Carroll came forward, the government initiated an investigation. It opened a matter on Mr. Denig. It worked very closely and cooperatively with Investigator Allard, who is the investigator for the Federal Defender's Office. In fact, two Cherokee officers came near here to go see Judge O'Carroll, left Cherokee to go find him to track all this down. So it wasn't for a lack of trying that the government pursued this, but at the end of the day there was just not enough evidence. The district court fully considered everything that both sides found and even considered evidence that it considered not to be admissible. Judge Reidinger, who by the way was not the trial judge, so he was not trying to just defend a case that he presided over, he allowed in offers of proof and permitted extensive briefing on complex evidentiary issues and then issued a 57-page order. So no one can say that the government didn't do its due diligence or the defense didn't do their due diligence or that the district court acted arbitrarily or irrationally in this case to exclude it. But Deborah Carroll's initial claim, which she later recanted and then just contradicted, just re-explained, reformulated, just simply could not be corroborated. Ms. Hester makes the point that, and you say that Judge Reidinger's order is thorough. It certainly is, but it seems at one point that he misspoke with respect to the burden, and Ms. Hester says that essentially he put the burden on Mr. Byrd to prove his innocence. Is that accurate? No. She makes that claim. I understand if you stand on your head and read that sentence that you could read it that way, but on the joint appendix page number 1171 of the order, it's the preceding page before the judge made that statement, it was clear that he cited the correct standard, and the standard is under Chavis that this would probably result in a new acquittal, that the new evidence would probably result in acquittal, and he understood that burden. And strong evidence would be required in this case to probably result in acquittal because this was a strong case from the government's perspective. We have the victim positively identifying the assailant and knew him by name. Did he ever waver in that identification? He never wavered on that identification. When he first was pulled out of the river and spoke to Theresa McCoy, he said John Byrd. In the mission hospital, he identified him as Little Johnny Byrd because there's John Byrd Sr. and John Byrd Jr. and John Byrd Jr., the one who was convicted, is the one with whom he worked in the roofing job tribally. He testified not once but twice at trial because the first trial there was a mistrial because somebody used the P word, polygraph, in violation of the motion limine. So we did it twice at trial. Even after this new evidence came forward, we, in our abundance of due diligence, went back to Mr. Schell and said, hey, these people have said these things. Does this jog any memories? And he was adamant that while he knew Mr. Denig and he drank with him a few times, he was not with him the night before Christmas or on Christmas Day, and he still stuck by the same description that it was Mr. Byrd who was the shooter. He was never getting hit in the head with a skillet? No, sir. I don't know where that came from. Again, there's no corroborating circumstances, so we don't know if that's true or if it's not or whether it happened on some other occasion. The original description by Mr. Carrow said there might have been some incident in Mr. Carrow, Joe Joe Carrow, there might have been some incident in the summertime. But in any event, now he had, he, Mr. Schell, had been shot in the face. If he had been hit with a skillet, I don't know if that would. He didn't even know if he, or are you just saying he didn't remember? Well, I'm saying there's no corroborating circumstances to indicate that ever occurred or not. But we did ask him, do you remember getting, you know, did this occur? And he said no. In fact, he said hell no. It did not occur. Is that in the record, what you're representing? Or is this just? It is in the record, yes. When the government filed its response to the motion for a new trial, we attached that information. I was just going to say he could have been too drunk to remember. Well, he could have been. And again, when you look at the strength of the government's case, because, of course, the government's case is based on essentially three things. One is the positive ID by the victim. And this is not one of those cases where he was picked out of a lineup. This is he knew him by name. And then you have the defendant taking flight upon first making eye contact with the detective when the only evidence, the only information that was out in the airwaves via scanner, police scanner, was that there was a wreck on Bunches Creek. So there's that flight. And then he hid in his closet while his father, who also swore to lie for him, to provide a false alibi for him, and told Police Chief Reed that he was not in the house when, in fact, he was hiding in the closet. And then you have the confession by the defendant, Mr. Bird. Now, sure, you can attack that confession, that ID, and that was fully vetted at the jury trial. Yes, no doubt Mr. Bird, I'm sorry, Mr. Schell was impaired by alcohol, as was Mr. Bird. Mr. Bird was drunk for that same time period, those two days as well, according to Ms. Littlejohn. How many times did Mr. Bird confess? I thought I had read somewhere that it was twice, but opposing counsel says it's only once. It was just, well, it was, I understand the court's confusion. It was on one occasion. So he was interviewed on two days. The first day he denied, and he said that he tried to assert an alibi that didn't pan out. It was conflicted with Ms. Littlejohn's testimony. The second day was the polygraph day. And the way the polygraph examinations work is the polygrapher, the SBI agent, Smith, he does the polygraph, and then when the result comes back, then they confront the person with the result. In this case, that's what happened. They confronted Mr. Bird with the result, and then he said, okay, I did it. And at that point, the agent then turned him over to the detectives who knew more about the case to get the details. That's the common practice. And so the two confessions that you might be thinking of is to Agent Smith, he said, I did it, or some words to that effect. And he just left it at that and then yielded the floor to Detective Owl, where he got the more thorough, although even that was only 15, 20 minutes because, as Mr. Bird indicated. Did he confess in this subsequent interview? He did. Yeah, so it was all within the same hour, but it was two different people or three different people because it was Detective Panther and Detective Owl who interviewed him following the polygraph exam. So, yes, he did say, I did it. And then the second one, he provided details. And one detail in particular, he said it was in the mountains, which is relevant. I understand you could attack that because, of course, the reservation is mountainous, but the downtown Cherokee is in the valley and Big Cove is up the mountain. But the most telling circumstance in that confession was he told the investigators about how Mr. Shell cursed him and invited him to shoot him. And that was a detail that was not even known to Detective Owl at the time that he was conducting the interview. Mr. Detective Owl didn't learn that from Mr. Shell until two days later because when Agent Sidwell from the FBI interviewed the victim at Mission Hospital, he was undergoing treatment. He was in a very bad way. I don't remember if his jaw was wired shut, but his jaw was fractured. He'd been shot in the face. And so his ability to articulate what happened was limited. And so that basically what Agent Sidwell got out of Mr. Shell was that it was little Johnny Bird. Perry Shell, his brother, testified to that fact in trial. And Agent Sidwell was able to pass that on to Detective Owl. So there's no evidence in this case that Detective Owl accepted a false confession and fed him the answers. He didn't know the answers to prompt him, and that one detail in particular. Did Mr. Shell corroborate Mr. Bird's statement that Mr. Shell had cursed him and invited him to shoot him? Yes. The exact language was slightly different. My recollection from the record is that Mr. Bird said something like, go ahead and shoot me, B. And what Mr. Shell said was he said, hell, you've got the gun, you might as well shoot me if you're going to kill me, or you might as well kill me if you're going to shoot me, or something like that. So the wording was slightly different. I mean, I get the point that you're making, that we've got a victim who's been rock solid in his identification. Of course, this wouldn't be the first time that someone who thought he was rock solid in identification turned out to be incorrect. And what troubled me about this case is that it did not appear to be a motive, at least in the trial, for this shooting. It just seemed to be a random, sporadic event. It appears that later on, somewhere in this record, there may have been a motive identified, but that wasn't presented to the jury. Is that right? It is right that we did not know about a motive at the time of the trial. That's right. We're certainly not saying there wasn't a motive. I mean, Schell was driving drunk all day, so it could be cut him off in traffic. Who knows what it was. And the court is correct that the post-trial, Mr. Schell learned, and this is in the record, this is part of the interview that we did as a follow-up to the Caro disclosures, and we submitted it on our brief to the district court, that he, Mr. Schell, learned post-trial that there was talk on the reservation that the reason Bird was mad at Schell was because Schell was in treatment with Bird's then-girlfriend, whose name escapes me, Cinda Taylor, and that drug treatment. And that during drug treatment, the allegation was that Mr. Schell was paying her in pills for sexual favors, and that that rumor was going around, and that's why Mr. Bird was mad at him. That was not released at trial, but we at least have one for the purpose of this hearing. Was that presented to Judge Reidinger? It was. And is that something that we're entitled to consider? It's in the record. Well, but I'm asking, it's the defendant's motion for a new trial based on new evidence. Are you saying that the government can now inject new evidence in order to rebut that motion? Well. Or are we stuck with the record that we have? Well, the issue to be decided is whether there's new evidence in this case that probably would result in an acquittal. And the evidence of the motive, I suppose, would be new evidence as well. To be honest, I don't really care if the court gives that a lot of stock or not. Perhaps at an abundance caution, you shouldn't, because I think it really doesn't matter much. Judge Reidinger did. I don't think he. Well, the court said he considered all of the evidence, even that which was not admissible. And it is true that I, well, let's see. Yeah, we didn't call Mr. Schell. And I'll be honest, I don't remember if I moved to admit that piece, that follow-up interview of him or not. I know I attached it to the government's response to the motion for a new trial. So the court had an opportunity to review it at some point. I don't remember if I moved to admit it at that hearing or not. Did you ever locate the scene of the crime? No, Your Honor. Your Honor, that area, that preserve is some 3,000 acres. And what happens is at the end of Bunches Creek, there's a gate that they keep closed at that time of year so that vehicles don't tear up the road. And Mr. Schell's testimony was that he had been out there wandering to collect locust nests to carve to make masks. He really could have been anywhere. And really, I don't fault the Cherokee police for not expending the manpower to look for it. Because let's say we had gone and put out a couple dozen officers and found a Schell casing. Well, lots of people shoot out there. So there was testimony about that. So there's really, it would be difficult to say this is a Schell case that had something to do with this case. Well, if you've got a victim who's obviously been drunk and he's saying, Bird shot me, but he can't remember where he got shot and he doesn't know why he got shot, it would seem to me that that would call into question his ability to accurately remember what happened. If he doesn't know where or why. And I agree. And that is a matter that was thoroughly vetted and articulated. Indeed, that was the sole substance of the trial. And we've had that trial and this new evidence. The question is, does this new evidence, would this new evidence probably result in an acquittal given those facts? And again, you can attack the confession and you can attack the witness identification. And the government has strong rebuttals for both of those things. Again, you could attack the identification as one normally would routinely about people get IDs wrong all the time. As we see in the meat, not all the time, but it happens occasionally. But those tend to be occasions where it's cross-racial and it's from a lineup. This is, in fact, the cross-racial aspects of this case are newer to the benefit of Mr. Schell, because, of course, Mr. Bird is an Indian and an old member of the tribe and Mr. Denig is not. And so while they're similar in size and stature, one's an Indian and one is not. One is a person who Mr. Schell knew well and one was, actually he knew both of them somewhat, but he knew Mr. Denig. You not only don't know where, you don't know why, but then you have the coincidence of somewhere in the woods these two guys end up together with no explanation of how they got together. What was your theory is that it was more than some kind of natural coincidence? Well, I mean, I don't know. I mean, again, it could have cut them off in traffic. It could have, Mr. Bird could have been out in the woods hunting and then saw him and he was mad about this Cinda Taylor thing. We just don't know. We have homicide cases all the time where we don't blame the government's case because the victim was unable to articulate the motive. And in this case he was, we don't know if it was because of the alcohol or because he was shot in the head. And so to some extent, you know, we have to give the guy a break for not remembering when he's been shot in the face. But also, you know, it's one thing to say we're going to attack the confession and then attack the identification, but to say we've got to defeat both of those. And with what? We're trying to defeat those with statements that are all over the place by Ms. Carroll that are not consistent. I mean, they're completely reformulated. Was there a gap in time between the shooting of Mr. Schell and the confession by Mr. Bird? It was approximately two weeks. I'd have to look and see. I didn't write down what the date of offense was, but it was Christmas Day and he was, it was January 9th. Because remember, Mr. Bird was in hiding in his father's closet for a couple of weeks with, I might add, Ms. Littlejohn, who was the sole witness at this alibi. And I will say I also disagree with the characterization that this alibi was ever corroborated. In fact, it was not. Ms. Littlejohn's statement of the timing was inconsistent with Mr. Bird's. And interestingly, where her statement of the alibi time falls short is exactly the relevant time period. The relevant time period as described by Ms. McCoy is that 11 to 12 o'clock hour on Christmas Day. And it was Mr. Bird's description that tried to encompass all the way up to 1230, whereas Ms. Littlejohn stopped at 11. And Ms. Littlejohn also talked about how Mr. Bird Sr. tried to, not coerce, but persuade her to testify falsely. And while on the stand, she said, I'm not doing so. And she also said she herself has medically-induced recollection problems. And that's important, too, because on this alibi, she didn't even get asked about where she was on Christmas Day until June. And her testimony on the stand was that there was lots of talk about what happened and what didn't happen and who was around. And then, so, you know, I mean, ask me, you know, in June what I did on Christmas Day, I would have a very difficult time doing that if I was asked for the first time in June. But what's also telling is that, you know, Ms. Littlejohn, even if she did have a corroborated alibi, which, of course, it was not corroborated by anything, but if she had an alibi, she let her boyfriend's son sit in jail without bringing that to anyone's attention. And, of course, that's just not credible. If someone who's an alibi witness has the keys to the jail, you would think they would go and use them rather than sit on them until the day of trial. So, and as far as Mr. Schell's recollection, it is not, we have to show not just that his memory is bad. I mean, to be sure, he had some memory issues, again, whether it's because he got shot in the face or because of the alcohol. But we also have to show, if we're going to square that with the Caro accounts, which depends on which one you're talking about, he not only didn't remember, but he affirmatively remembered something that was incorrect, right? The defense, in order to justify getting a new trial, has to get a jury to bite on the notion that the skillet thing happened the night before and that he got his, he was taken down there. And it's not just that he doesn't, he, Mr. Schell, doesn't remember that, but he remembers something different. And that's a whole another order of memory problem, or to ascribe that to a memory problem is very difficult. It is not that he simply failed to recall, but he recalled something different and did so adamantly. And if the court just will remember there is a victim in this case, and that victim, imagine how frustrating it must be for that victim who consistently said, I know who shot me. And then somebody makes an incredible statement. I'm sorry, I'm over time. Thank you. Makes an incredible statement on the side and then changes it and changes it and changes it. And then to have to go back to that person and say, we might have to have a new trial over this, that's got to be incredibly frustrating. But they don't meet their burden to probably result in a new acquittal. Thank you. Thank you, Mr. Gass. Ms. Hester. I think it's important for the court, when you're thinking about the amount of the new evidence, to consider the fact that at the first trial the defense had no alternative theory for how Garshell got shot, because he had no recollection of where he had been the night before. There was nowhere to start. And when you go to a jury and you say, I didn't do it, but I don't know how it was done, that is a heck of a lot different than going to the jury and saying, I didn't do it, and here is evidence about how it actually happened. That gives the jury a reason to disbelieve the statements of Garshell and the admissions of John Byrd, both of which were already attacked at the first trial, but now are even more subject to disbelief because of this new evidence. And the government makes it sound as if Deborah Caro's statements that her husband told her, I shot Gars, is the only evidence that we have. But there is a wealth of evidence aside from that. First of all, you've got Deneig making a statement to Caro's nephew, Jojo Caro, basically giving the same story, except I shot him, that, you know, he said, Deneig said to me, this guy was hitting on Deb, and so we beat him with a stock of a rifle and shot him. I mean, that is some corroboration there. It corroborates her story that she was told that Deneig shot Shell after Shell was hitting on her, and he's also told that same version of events to police and to another investigator. He's repeated that version of events over and over again. As far as the alibi is concerned, the government says that Miss Littlejohn did not corroborate the alibi, but that's not correct because the only difference in the two stories is what time they left Miss Littlejohn's daughter's house after having breakfast and opening presents. And what Miss Littlejohn said was he was at our ‑‑ we went back home, and he stayed there until his grandma came to pick him up at 1245. That story remained the same. So there's no question that she was saying he was with me the whole time. And as far as her not coming forward earlier, she didn't know when Gar Shell was shot, so she had no reason to know that it was important for her to say that John Byrd was with her on Christmas Eve and Christmas Day if she did not know what time he was shot. I want to talk for a minute about Shell's new statement. Every time Gar Shell gives a statement or testifies, he adds more information to his story. And I'm not saying that he's doing that on purpose, but I think he's being influenced by things that he hears in the community, and then he adopts that as his recollection. But if you look at his new statement and compare it to Cinda Taylor's statement, which is on 685 of the Joint Appendix, he was not in rehab with Cinda Taylor until 2011. So it is impossible that this story about trading Percocets for sex could have been the motive for any shooting that happened in 2008. And that's just an example of how unreliable his memory is, not through any fault of his own other than having been an alcoholic for 50 years, but he also has some damage from the shooting. He's under guardianship now because of his disability. So I think you have to seriously consider his inability to formulate an accurate memory when you're looking at this. Finally, as far as Byrd's statement to police, the government points out that he said something to the effect that Shell said, shoot me, bitch, before he shot him. And the government asserts that Al did not know that something to that effect had been said, but that is not true. If you look on page 519 of the Joint Appendix, that is Agent Sidwell's report, which was dictated and drafted on Christmas Day, the same day that he talked to Shell. And it just defies belief to think that after Al asked Sidwell, an FBI agent, to interview this witness, that that transcript of the conversation would not have been sent to Al afterward. And we know, based on what Al did during his interrogation of John Byrd, that he showed him photographs of Shell that had been faxed to him from Sidwell. Sidwell must have faxed him also that December 25th report. And, in fact, Al admitted that he specifically asked Byrd, when he was interrogating him, did Shell say anything to you before you shot him? I mean, that is some pretty strong evidence right there that Al, in fact, knew what had been said. And it's not recorded, so we don't have any way of knowing exactly how he asked that question. So it's entirely probable that he suggested that detail to John Byrd. I'm just about out of time. I thank the court. Thank you. Thank you, Ms. Hester. And I'll ask the clerk to adjourn court, and then we'll come down and agree counsel. This honorable court stands adjourned. The Senate died. God save the United States and this honorable court.
judges: William B. Traxler, Jr., G. Steven Agee, Albert Diaz